**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
VANGUARD DEALER SERVICES, LLC :   Civ. No. 3:21CV00659(SALM)
                             :
v.                           :
                             :
BOTTOM LINE DRIVEN, LLC,      :   February 7, 2022
JOSEPH DIRAFFAELE, and        :
CREDITGUARD CORPORATION       :
                             :
-----------------------------x
```

<u>**RULING ON MOTION TO DISMISS [Doc. #19]**</u>

Defendant CreditGuard Corporation ("CreditGuard") has filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) seeking to dismiss all claims against it. [Doc. #19]. Vanguard Dealer Services, LLC ("plaintiff" or "Vanguard")[1] has filed a memorandum in opposition to the motion to dismiss [Doc. #32], to which CreditGuard has filed a reply. [Doc. #37]. For the reasons stated herein, the Motion to Dismiss [**Doc. #19**] is **GRANTED.**

**I.   <u>Procedural Background</u>**

Plaintiff brought this action on May 12, 2021, against three named defendants: Bottom Line Driven, LLC ("Bottom Line");

---

[1] Consistent with the Complaint, Vanguard Dealer Services, LLC, and its predecessor company -- Vanguard Dealer Services, Inc. -- are interchangeably referred to as "Vanguard" throughout this Ruling. <u>See</u> Doc. #1 at 2.

Joseph DiRaffaele; and CreditGuard. See Doc. #1 at 1-2.[2]
CreditGuard filed the instant Motion to Dismiss on July 8, 2021.
See Doc. #19. This matter was transferred to the undersigned on
October 25, 2021. See Doc. #42.

II.  **Factual Background**

The Court accepts the following allegations as true, solely
for purposes of this Motion to Dismiss.

Vanguard is a New Jersey limited liability company, see
Doc. #1 at 1, that provides car dealerships throughout the
United States with various products "that are designed to
protect the consumer's investment in an automobile." Id. at 3.

On August 1, 2019, Vanguard purchased non-party Aftermarket
Specialty ("Aftermarket"). See id. at 2. At that time, defendant
DiRaffaele was an Aftermarket employee. See id. DiRaffaele was
also the sole employee of defendant Bottom Line, a Connecticut
limited liability company. See id. at 1. "On August 31, 2011,
Defendants DiRaffaele and Bottom Line Driven entered into
an agency relationship with Aftermarket[.]" Id. at 2. After
acquiring Aftermarket, plaintiff offered DiRaffaele continued
employment with Vanguard. See id. at 2. DiRaffaele refused to

---

[2] Throughout this Ruling, the Court cites to the page numbers
reflected in each document's ECF header, rather than any
numbering applied by the filing party.

"sign Vanguard's required non-compete agreement[,]" id. at 2, however, and rejected its employment offer. Id.

Shortly thereafter, Vanguard's General Manager, Mickey Quinn, met with DiRaffaele to discuss his future at the company. See id. at 2-3. At that meeting, Mr. Quinn explained that "Vanguard would not employ anyone who would not sign its standard non-compete, given that employees of Vanguard have access to highly confidential competitive information that would harm Vanguard if used in competition with it." Id. In response, DiRaffaele told Mr. Quinn that "he would take no action to harm Vanguard, but that he would not sign a non-compete because he wanted to keep his business, Bottom Line Driven." Id. at 3.

Ultimately, the parties agreed that "DiRaffaele could continue to provide services as an agent for Vanguard" through Bottom Line, "with the understanding that his continued relationship was contingent upon him honoring his obligations as an agent for Vanguard not to harm Vanguard and not to engage in any activity that would be a conflict of interest or directly competitive with Vanguard." Id. at 3. No written agreement encompassing these matters is alleged.

In his continued role with Vanguard, DiRaffaele trained "dealerships' finance and insurance ('F&I') department employees on how to sell the products offered by Vanguard to dealership customers." Id. at 4. DiRaffaele and Bottom Line "were able to

develop relationships with Vanguard customers." Id. at 4. "They also had intimate first-hand knowledge of the [customers'] likes, dislikes and preferences for products being offered at the dealership[s.]" Id. at 4-5.

"By virtue of his agency relationship with Vanguard, DiRaffaele became familiar with Vanguard's customers, its vendors and suppliers, as well as its pricing policies and practices, and other confidential and/or proprietary information belonging to Vanguard." Id. at 4. Similarly, DiRaffaele "was given information about the finance and insurance products that dealerships used, what type and how many F&I products were sold at the dealership level, and how valuable the business generated by the dealership was to Vanguard[.]" Id.

When the COVID-19 pandemic struck, DiRaffaele -- who was paid purely on commission, see id. at 3 -- saw his income "decrease[] considerably because there was no business for him to be paid on." Id. at 5. "DiRaffaele became disgruntled and repeatedly demanded that Vanguard pay him even though he was not entitled to payment and was not a Vanguard employee because he chose not to sign the non-compete agreement." Id.

In March 2021, DiRaffaele threatened to "leave Vangaurd and take Vanguard's customers with him if Vanguard did not pay him more." Id. Vanguard "refused to bow to DiRaffaele's threats and demands for increased compensation[,]" and "[o]n March 29, 2021,

DiRaffaele sent Vanguard an email notifying Vanguard that Bottom Line Driven would no longer provide services to Vanguard after April 1, 2021." Id.

"Within days, Vanguard learned that DiRaffaele had affiliated himself with one of Vanguard's competitors, CreditGuard[.]" Id. Upon returning from the Easter holiday on April 5, 2021, Vanguard "contacted two customers in which [it] had involved or introduced to DiRaffaele[.]" Id. at 6 (sic). Each of those customers told Vanguard that it "was going to change direction and go with CreditGuard[.]" Id. In the following days, more customers did the same, with four dealerships ultimately "going to CreditGuard so that they can continue to use DiRaffaele to train their F&I managers." Id. at 7.

Plaintiff contends that the speed with which its clients joined CreditGuard proves that DiRaffaele was "actively involved" in diverting Vanguard's clients to CreditGuard while he was Vanguard's agent. Id. at 6. "Given the nature of Vanguard's business and that of its competitors, it would be impossible for DiRaffaele to have contracted with CreditGuard, introduced its products to the dealerships and diverted those dealerships to CreditGuard over the Easter holiday weekend (between April 1 and April 5)[.]" Id.

Based on these allegations, plaintiff concludes that: (1) "CreditGuard was aware that DiRaffaele was Vanguard's agent[,]" id. at 7; (2) "CreditGuard [was] aware of Vanguard's business relationships with its customers[,]" id. at 9; (3) "CreditGuard was aware that the new business DiRaffaele was diverting to it was from Vanguard's customers[,]" id. at 7; (4) "[o]n information and belief, DiRaffaele has shared confidential business information ... with ... CreditGuard[,]" id.; (5) "CreditGuard was complicit in interfering with and diverting Vanguard's customers to CreditGuard[,]" id.; and (6) "CreditGuard took affirmative steps while DiRaffaele was Vanguard's agent to divert Vanguard's customers to CreditGuard[.]" Id. at 9.

## III. **Legal Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted). In short, the Court's "role in reviewing a motion to dismiss under Rule

12(b)(6) is to determine if the complaint -- apart from any of its conclusory allegations -- alleges enough facts to state a plausible claim for relief." Taylor Theunissen, M.D., LLC v. United HealthCare Grp., Inc., 365 F. Supp. 3d 242, 246 (D. Conn. 2019).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).

## IV.  **Discussion**

Vanguard brings three claims against CreditGuard. Count One asserts a claim for "Breach of the Duty of Loyalty[,]" alleging that "CreditGuard is jointly and severally liable to Vanguard for any damages resulting from DiRaffaele's breach[]" of that duty. Doc. #1 at 8. Count Two alleges that CreditGuard is liable for tortious interference on the grounds that it "intentionally and tortiously interfered with the relationships Vanguard had with its customers." Id. at 9. Count Three asserts that CreditGuard engaged in "deceptive, unscrupulous, immoral,

oppressive and unethical[]" actions in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). Id. at 10. CreditGuard moves to dismiss all claims against it. See Doc. #19 at 1.

### A.   Duty of Loyalty

Plaintiff contends that CreditGuard is liable for DiRaffaele's alleged breach of fiduciary duty under two distinct theories of liability. See Doc. #32 at 6-12. Vanguard first asserts that CreditGuard "Worked Together in Concert" with DiRaffaele to breach his duty of loyalty. Id. at 6. Vanguard then contends that CreditGuard aided and abetted DiRaffaele's tortious conduct. See id. at 10. Neither theory states a claim upon which relief can be granted.

### 1.   Acting in Concert

Vanguard contends that CreditGuard acted in concert with DiRaffaele to breach his duty of loyalty. See id. at 6. Vanguard argues that liability arises under this theory when a party commits "'a tortious act in concert with [another party] or pursuant to a common design with him[.]'" Id. at 6 (quoting Restatement (Second) of Torts §876 (1979)).

Vanguard fails to allege facts supporting its conclusion that CreditGuard acted in concert with DiRaffaele to breach his fiduciary duty. Plaintiff merely asserts:

> Given the nature of Vanguard's business and that of its competitors, it would be impossible for DiRaffaele to have contracted with CreditGuard, introduced its products to the dealerships and diverted those dealerships to CreditGuard over the Easter holiday weekend (between April 1 and April 5) unless DiRaffaele had been actively involved in that effort while he was an agent of Vanguard.

Doc. #1 at 6.

That conclusory declaration is insufficient to state a claim. Plaintiff does not plead facts alleging how the "nature of Vanguard's business" made it impossible for its clients to join CreditGuard over the holiday weekend. Id. Plaintiff concludes without any factual support that CreditGuard was "conspiring" with DiRaffaele, received "confidential business information" from DiRaffaele, and was "complicit in interfering with and diverting Vanguard's customers to CreditGuard[.]" Id. at 7. Absent factual support, plaintiff's threadbare accusations that defendants conspired to breach DiRaffaele's fiduciary duty are insufficient to survive a motion to dismiss. See Glob. Beauty Grp., LLC v. Visual Beauty, LLC, No. 16CV09214(KPF), 2018 WL 840102, at *9 (S.D.N.Y. Feb. 12, 2018) ("It is not enough for Plaintiffs to simply state that the Moving Defendants conspired and acted in concert with [another defendant]. Plaintiffs must allege some facts that, if proven, would bear this out."); see also Tapia-Ortiz v. Winter, 185 F.3d 8, 11 (2d Cir. 1999) (finding "conclusory, vague, and general allegations"

insufficient to support claim for conspiracy); Russo v. Glasser, 279 F. Supp. 2d 136, 144 (D. Conn. 2003) ("[V]ague and conclusory conspiracy allegations are insufficient to state a claim.").

Vanguard relies on two Connecticut Superior Court decisions to support its argument that the allegations of the Complaint are sufficient. See Doc. #32 at 7-10. Neither is persuasive in these circumstances.

Plaintiff relies heavily upon Reinken v. Conlon to support its acting in concert theory. See FST-CV-19-6040429-S, 2020 WL 6483135 (Conn. Super. Ct. Oct. 13, 2020). In Reinken, plaintiff owned a law firm. See id. at *1. He alleged that an attorney, "while still an associate with the plaintiff's law firm, agreed with the defendants to form a Connecticut branch of the defendants' Rhode Island law firm," taking "proprietary information" with her. Id. Plaintiff alleged that the associate and defendant firm agreed "to convince clients to leave the plaintiff" law firm. Id.

Defendants moved to strike plaintiff's fiduciary duty claim, asserting that it failed to allege "a direct fiduciary duty to the plaintiff -- a fiduciary duty that does not rely upon [the associate] as an intermediary/link." Id. at *2. The

court[3] denied the motion to strike. See id. at *12. Reinken may be instructive here, but not in the way in which Vanguard hopes. The Amended Complaint in Reinken made the sort of specific factual allegations that are not made by Vanguard against CreditGuard.[4] See Amended Complaint, Reinken v. Conlon, No. FST-CV-19-6040429-S, (Conn. Super. Ct. Aug. 13, 2019), Doc. #109.00. For example, the Reinken plaintiff asserted that defendants, either individually or through plaintiff's associate: (1) "[told] Plaintiff's clients that the Plaintiff's firm was closing or was otherwise not viable after the departure of [plaintiff's associate,]" id. at 7-8; (2) "[u]tiliz[ed] the Plaintiff's staff including a paralegal, Wendy Larsen, to systematically contact virtually all of the Plaintiff's clients exclusively for the benefit of the Defendants[,]" id. at 7; and (3) "conspire[ed] and [met] with the Plaintiff's associate" during business hours in Rhode Island while the associate remained employed by the plaintiff. Id. Such allegations go far beyond the purely conclusory assertion here that "it would be

---

[3] The decision was issued by a Judge Trial Referee.

[4] The Court takes judicial notice of the operative complaint to better understand and apply the ruling in Reinken. "Courts in this circuit routinely take judicial notice of complaints and other publicly filed documents." White Plains Hous. Auth. v. Getty Properties Corp., No. 13CV06282(NSR), 2014 WL 7183991, at *2 (S.D.N.Y. Dec. 16, 2014).

impossible" for the events of April 2021 to unfold as they did if CreditGuard had not acted improperly. Doc. #1 at 6.

Plaintiff's reliance on Governors Grove Condo. Ass'n, Inc. v. Hill Dev. Corp. is similarly misplaced. See 414 A.2d 1177 (Conn. Super. Ct. 1980). There, a defendant developer entered into an agreement with a defendant contractor to install cedar roofs on condominiums that were under construction. See id. at 1179. When those roofs were later found to be defective, plaintiff -- the condominium association -- brought suit alleging, inter alia, that the contractor had "participat[ed] in a conspiracy with [the developer] to conceal the defects, which concealment was a violation of [the developer's] fiduciary duty to the association." Id. at 1184.

The Court found that the "the allegations that [the contractor] created the defects, that it knew of them, and that it conspired with [the developer] to conceal them in violation of [the developer's] fiduciary duty are legally sufficient" to state a claim against the contractor. Id. The Court has been unable to review the pleadings in Governors Grove, because the case is more than 40 years old. However, the decision confirms that plaintiff there alleged specific facts to support its claims. Indeed, as the Court observed, it was the contractor who

<u>created</u> the alleged defect,[5] in that case, and the contractor was expressly alleged to be "aware" of the specific fact "that the cedar roofs were defective and/or improperly installed." <u>Id.</u> at 1180. Crucially, that allegation was supported by additional facts: "The defective construction was apparent to [both the developer and the contractor] because leaks and seepage from rain and snow were a problem when the property was conveyed from [the contractor] to [the developer]." <u>Id.</u>

The decisions in <u>Reinken</u> and <u>Governors Grove</u> are not binding on this Court. However, consideration of those decisions supports a finding that Vanguard's conclusory assertions are insufficient to support its "acting in concert" theory of liability.[6]

## 2.  <u>Aiding and Abetting</u>

Plaintiff also fails to state a claim against CreditGuard for aiding and abetting DiRaffaele's alleged breach of fiduciary duty. To state a claim "for aiding and abetting a breach of fiduciary duty under Connecticut law," a plaintiff must allege: "(1) a wrong by the primary violator or principal; (2) knowledge

---

[5] Furthermore, plaintiff alleged that the defective construction violated the <u>contractor's</u> "warranty that its work would be performed in a good and workmanlike manner[.]" <u>Id.</u> at 1180.

[6] This Court does not reach CreditGuard's argument that an "acting in concert" theory of liability is not cognizable under Connecticut law. <u>See</u> Doc. #37 at 4-5.

of that wrong by the alleged aider and abettor; and (3)
substantial assistance to the principal by the aider and abettor
in achievement of the primary violation." Milso Indus. Corp. v.
Nazzaro, No. 3:08CV01026(AWT), 2012 WL 3778978, at *11 (D. Conn.
Aug. 30, 2012) (citation and quotation marks omitted).

Plaintiff does not adequately allege that CreditGuard had
knowledge of DiRaffaele's alleged breach of fiduciary duty. To
sufficiently plead knowledge, plaintiff must assert facts
showing that the aider or abettor had "actual knowledge of the
underlying tort or act[ed] with reckless indifference to the
possibility that the underlying tort [was] occurring." Short v.
Connecticut Cmty. Bank, N.A., No. 3:09CV01955(VLB), 2012 WL
1057302, at *12 (D. Conn. Mar. 28, 2012).

Plaintiff asserts that "CreditGuard was aware that
DiRaffaele was Vanguard's agent[,]" and "that the new busines
DiRaffaele was diverting to it was from Vanguard's customers."
Doc. #1 at 7. Vanguard assumes, asks the Court to infer, that
CreditGuard must have known that DiRaffaele both (1) owed and
(2) was breaching a duty of loyalty to Vanguard. See id.; see
also Doc. #32 at 11. But these are mere legal conclusions. To
survive a motion to dismiss, plaintiff must plead facts showing
how CreditGuard knew that DiRaffaele owed a duty of loyalty to
Vanguard, and how it knew (or recklessly disregarded the
possibility) that he was engaged in wrongful conduct. See

Marcano v. Vendetto, No. CV19-6096427-S, 2020 WL 8455497, at *4
(Conn. Super. Ct. Dec. 15, 2020) ("[W]ithout any other factual
allegations from which the court can infer that the defendant
was generally aware of her part in the tortious interference
with the plaintiff's employment relationship -- such as an
alleged conversation between the defendant and the co-defendants
regarding said tortious interference -- the court concludes that
the plaintiff has failed to sufficiently allege the second
element of an aiding and abetting cause of action[.]"). Absent
such factual allegations, plaintiff's claim amounts to a "bald
assertion, without any supporting allegations, that
[CreditGuard] knew" that DiRaffaele had breached his fiduciary
duty. In re Citigroup ERISA Litig., 662 F.3d 128, 141 (2d Cir.
2011), abrogated on other grounds by Fifth Third Bancorp v.
Dudenhoeffer, 573 U.S. 409 (2014).

Furthermore, the Complaint makes no factual allegations
that CreditGuard provided "substantial assistance to" DiRaffaele
"in achievement of the primary violation." Milso Indus., 2012 WL
3778978, at *11. The Complaint alleges that CreditGuard
"benefitted financially" from plaintiff's actions, Doc. #1 at 7,
and then concludes, without factual support, that CreditGuard
must have been "participating [in] and encouraging" DiRaffaele's
breach of the duty of loyalty. Id. at 8.

Plaintiff's bald assertions and conclusions are insufficient to support a claim under an aiding and abetting theory.

Accordingly, plaintiff has failed to state a claim against CreditGuard, under either of its theories, for breach of the duty of loyalty. Count One is therefore **DISMISSED** as against CreditGuard.

**B.   Tortious Interference**

Plaintiff fails to state a claim against CreditGuard for tortious interference "with Vanguard's beneficial business relationships[.]" Doc. #32 at 12. To state a claim for tortious interference, a plaintiff must allege: "(1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was cause[d] by the defendant's tortious conduct." Rioux v. Barry, 927 A.2d 304, 311-12 (Conn. 2007).

CreditGuard contends that plaintiff fails to adequately allege that it engaged in tortious conduct. See Doc. #19-1 at 7-10.

> [N]ot every act that disturbs a contract or business expectancy is actionable. For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty

of fraud, misrepresentation, intimidation or molestation
or that the defendant acted maliciously.

Robert S. Weiss & Assocs., Inc. v. Wiederlight, 546 A.2d 216,
222-23 (Conn. 1988) (citations and quotation marks omitted). "A
claim is made out only when interference resulting in injury to
another is wrongful by some measure beyond the fact of the
interference itself." Id. at 223 (citations and quotation marks
omitted).

Plaintiff has not pled facts supporting its conclusion that
CreditGuard "intentionally and tortiously interfered with the
relationships Vanguard had with its customers." Doc. #1 at 9.
Indeed, the Complaint makes no allegation that CreditGuard
engaged in any independently tortious conduct "beyond the fact
of the interference itself." Robert S. Weiss & Assocs., 546 A.2d
at 223 (citations and quotation marks omitted). After alleging
that several of its clients joined CreditGuard shortly after
DiRaffaele's departure, plaintiff simply concludes that
CreditGuard must have taken "affirmative steps" to divert
Vanguard's customers to CreditGuard, Doc. #1 at 9, and
"conspir[ed]" with DiRaffaele while he was Vanguard's agent. Id.
at 7. Plaintiff's "allegations are naked assertions devoid of
further factual enhancement to show that [defendant's] conduct
was done maliciously or that [defendant] used fraud,
misrepresentation, intimidation or molestation." Greenwich Taxi,

<u>Inc. v. Uber Techs., Inc.</u>, 123 F. Supp. 3d 327, 343 (D. Conn. 2015) (citation and quotation marks omitted). Plaintiff has therefore "failed to plead factual allegations essential to an action for tortious interference with contractual relationships[,]" <u>id.</u>, and thus, Count Two as against CreditGuard is **DISMISSED**.[7]

### C.    CUTPA

Finally, plaintiff fails to state a viable CUTPA claim against CreditGuard. CUTPA provides, in relevant part: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a). "A CUTPA claim consists of three basic elements: (1) an ascertainable loss of money or property (2) that was caused by an unfair method of competition or an unfair or deceptive act (3) that occurred in the conduct of trade or commerce." <u>Stevenson v. Riverside Motorcars LLC</u>, No. 3:21CV00320(KAD), 2021 WL 5051667, at *3 (D. Conn. Nov. 1, 2021) (citing <u>Cenatiempo v. Bank of Am., N.A.</u>, 219 A.3d 767, 781–83 (Conn. 2019)). To determine whether a practice is "unfair" within the meaning of CUTPA, courts consider:

---

[7] In light of plaintiff's failure to adequately allege that CreditGuard engaged in tortious conduct, the Court does not reach CreditGuard's argument that "Plaintiff Fails to Allege That Plaintiff Had Relationships with the Dealerships That are Actionable[.]" <u>See</u> Doc. #19-1 at 10.

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise -- in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers[,] competitors or other businesspersons.

Cenatiempo, 219 A.3d at 782-83 (citation and quotation marks omitted).

Vanguard does not allege that CreditGuard, itself, engaged in any unfair trade practice. Rather, plaintiff simply alleges that "[t]he use of Vanguard's competitively sensitive business information by trusted agents to financially benefit themselves and CreditGuard provided CreditGuard with an unfair advantage over its competitors[.]" Doc. #1 at 10 (emphasis added). The bad actor, in this allegation, is DiRaffaele, not CreditGuard. The mere allegation that CreditGuard benefitted from allegedly improper actions taken by others is insufficient to state a claim under CUTPA. "[N]aked allegations of usurpation and diversion of business are insufficient to maintain a cause of action under CUTPA." Webster Fin. Corp. v. McDonald, No. CV08-4016026-S, 2009 WL 416059, at *16 (Conn. Super. Ct. Jan. 28, 2009) (citation and quotation marks omitted).

This Court has previously dismissed a CUTPA claim against the new employer of a defendant alleged to have breached a restrictive covenant:

[P]laintiff alleges that defendant VNS "permitted" the other defendants to breach their restrictive covenant and then took advantage of the breach. It also alleges in conclusory fashion that VNS acted in concert with the other defendants and caused the breach by "wrongfully exercising control and dominion" over plaintiff's customer list. These allegations do not allow the court to draw the reasonable inference that VNS misappropriated plaintiff's customer list. At most, the Complaint plausibly alleges that VNS knowingly benefited from its new employees' breach of a restrictive covenant. It therefore fails to state a claim for relief under CUTPA.

S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn., No. 3:13CV00792(RNC)(DFM), 2014 WL 12756150, at *8 (D. Conn. Mar. 13, 2014) (sic), recommended ruling adopted, Doc. #87 (D. Conn. Mar. 29, 2014). This holding is squarely on point. Plaintiff argues, in essence, as did the plaintiff in Southern Home Care Services, that CreditGuard unfairly benefitted from DiRaffaele's bad acts. That is insufficient to state a CUTPA claim against CreditGuard.[8]

Accordingly, plaintiff's CUTPA claim against CreditGuard is **DISMISSED.**

---

[8] The instant case is even weaker as against CreditGuard, because here, DiRaffaele did not have a non-compete agreement. Indeed, even if DiRaffaele had been subject to a non-compete agreement, and CreditGuard was aware of that agreement, that fact alone would be insufficient to state a CUTPA claim against CreditGuard. See Sanford Hall Agency, Inc. v. Dezanni, No. CV04-4000576, 2004 WL 3090673, at *6 (Conn. Super. Ct. Dec. 2, 2004) (rejecting idea that "hiring an individual already employed by another offends any public policies[]").

## V.   <u>Conclusion</u>

Thus, for the reasons stated, the Motion to Dismiss [**Doc. #19**] is **GRANTED**.

Judgment shall enter in favor of CreditGuard Corporation, and the Clerk shall terminate CreditGuard Corporation as a defendant.

It is so ordered at New Haven, Connecticut, this 7th day of February, 2022.

/s/ _____
HON. SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE
