**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

VANGUARD DEALER SERVICES, LLC,
    *Plaintiff*,

    v.

BOTTOM LINE DRIVEN, LLC *et al.*
    *Defendants*.

No. 3:21-cv-00659 (JAM)

**RULING ON PENDING MOTIONS
AND ON OBJECTION TO MAGISTRATE JUDGE RULING**

This case involves the sale of finance and insurance products at motor vehicle dealerships. The plaintiff is Vanguard Dealer Services, LLC. The defendants are Bottom Line Driven, LLC, and its principal owner, Joseph DiRaffaele.

These parties once did business together in the promotion and sale of finance and insurance products at various dealerships. But their relationship broke down, and now the parties have become embroiled in years of unusually intensive and acrimonious litigation.

Vanguard claims that the defendants tried to steal four of its dealership customers, thereby allegedly breaching a duty of loyalty, tortiously interfering with business relationships, violating the Connecticut Unfair Trade Practices Act (CUTPA), reaping unjust enrichment, and breaking an oral contract. The defendants have counterclaimed alleging a range of unfair misconduct against them in violation of CUTPA.

Now pending before me are the parties' cross-motions for summary judgment, a motion to preclude an expert, a motion to supplement the summary judgment record, a motion to allow supplemental briefing on summary judgment, and an objection to Magistrate Judge Vatti's ruling with respect to the filing of an amended counterclaim and sealing matters.

For the reasons set forth below, I will grant the defendants' motion for summary judgment as to all of Vanguard's claims. There is no genuine fact issue as to whether Vanguard can show damages from the defendants' alleged misconduct. Likewise, I will deny Vanguard's cross-motion for summary judgment with respect to three of its claims.

I will further grant the defendants' motion to preclude Vanguard's damages expert. The expert has failed to identify a relevant measure of cognizable damages to Vanguard as well as to abide by the Court's express limitation with respect to the scope of analysis.

I will also deny Vanguard's motion to supplement the summary judgment record to reflect its recent merger with another company that is not a party to this litigation. Vanguard did not act with diligence, and its motion to supplement will cause unfair prejudice.

As to the defendants' CUTPA counterclaim, I will deny as moot for now Vanguard's motion for summary judgment in light of the defendants' filing of a second amended counterclaim. Similarly, I will deny as premature the defendants' motion for leave to file supplemental summary judgment briefing with respect to the second amended counterclaim in view of the fact that Vanguard has yet to file an answer or other pleading response to this amended counterclaim. Finally, I will overrule Vanguard's objections to Judge Vatti's order allowing the filing of the second amended counterclaim and as to sealing matters.

In short, all of Vanguard's claims against the defendants are dismissed with prejudice. This case shall now proceed solely with respect to the defendants' counterclaim for unfair trade practices against Vanguard.

## BACKGROUND

The parties to this case do business involving so-called "Finance and Insurance" (F&I) products, which are ordinarily sold by car dealerships in connection with the sale of motor

vehicles.[1] F&I products are designed to protect the consumer's investment in a purchased vehicle, and they include products such as vehicle service contracts, gap insurance, tire and wheel protection, ding and dent coverage, theft prevention, glass etching and chemical coatings and paint protection applications.[2]

F&I products are originated by product provider companies that are responsible for processing and paying claims by consumers.[3] Product providers are sometimes in turn represented by intermediary companies or agencies that place the providers' F&I products with particular automobile dealerships.[4] When a consumer buys an F&I product, portions of the consumer's payment go to the automobile dealership, the placement agency (if any), and the product provider.[5]

Vanguard Dealer Services, LLC is a New Jersey-based limited liability company owned by Spectrum Automotive Holdings—a Delaware corporation.[6] At times relevant to this action, Vanguard provided F&I products to automobile dealerships that were sourced from product providers including third-party vendors and insurance companies.[7]

Bottom Line Driven, LLC is a Connecticut-based limited liability company that has operated since 2009 with Joseph DiRaffaele as its sole member (until 2021 when his wife joined him).[8] At times relevant to this action, Bottom Line—through DiRaffaele—provided a variety of

---

[1] Doc. #244 at 1 (¶ 1). Most of the record citations in this ruling are to one or both of the parties' respective statements of material facts and their respective responses to the extent that these documents establish that certain facts are not in dispute.

[2] Doc. #251-1 at 3-4 (¶ 3).

[3] Doc. #244 at 1 (¶ 2).

[4] *Id.* at 1-2 (¶ 3).

[5] *Id.* at 2 (¶ 4).

[6] Doc. #251-1 at 3 (¶ 1).

[7] *Id.* at 3 (¶ 2).

[8] *Id.* at 11 (¶ 18).

services to automobile dealerships, including sales training, F&I consulting, and temporary employment services.[9]

Aftermarket Specialty Company, LLC is another Connecticut-based limited liability company that—like Vanguard—acted as an agent for F&I products, placing those products with car dealerships.[10] DiRaffaele and Bottom Line began working with Aftermarket in approximately 2011 subject to changing payment arrangements.[11] In early 2013, DiRaffaele began to collect wages from Aftermarket and enrolled in healthcare and 401(k) plans offered by Aftermarket to its employees.[12]

Spectrum acquired Aftermarket in August 2019, making Vanguard and Aftermarket "sister" companies owned by the same parent company.[13] Aftermarket was engaged in the same primary F&I business activities as Vanguard, but with a customer base located exclusively in Connecticut.[14] Following the acquisition, Frederick Marino continued to manage Aftermarket's business and serve as the company's president.[15]

After Spectrum's purchase of Aftermarket, Vanguard employees began providing finance, accounting, and payroll services for Aftermarket.[16] But Vanguard itself was not registered to do business in Connecticut prior to the filing of this lawsuit.[17] Nor at the time of the close of discovery or the filing of summary judgment motions had there been any contract

---

[9] Doc. #244 at 2-4 (¶¶ 5-9); Doc. #251-1 at 13-14 (¶ 25).
[10] Doc. #244 at 1-2, 4 (¶¶ 3, 11), #251-1 at 12 (¶ 20).
[11] Doc. #251-1 at 12-13 (¶ 23).
[12] *Id.* at 14 (¶ 27).
[13] Doc. #244 at 4 (¶ 10); Doc. #251-1 at 11-12 (¶ 19).
[14] Doc. #251-1 at 12 (¶ 20).
[15] Doc. #244 at 4-5 (¶ 14).
[16] Doc. #251-1 at 8-10 (¶¶ 13, 15).
[17] It appears that Vanguard registered in 2023. *See* Doc. #246-2.

between Vanguard and Aftermarket transferring or assigning any of Aftermarket's rights to Vanguard.[18]

In January 2020, DiRaffaele declined to execute Vanguard's non-compete agreement.[19] As a result, he stopped taking wages and benefits from Aftermarket, instead receiving the benefit of commission payments made to Bottom Line for his continuing services.[20]

Four automobile dealerships in Connecticut are at the center of this lawsuit: Stamford Ford, Greentree Toyota, Toyota of Greenwich, and Todd Maserati.[21] Prior to early 2021, Aftermarket commonly placed F&I products with these dealerships, frequently with the aid of Bottom Line and DiRaffaele.[22] The four dealerships paid commissions to Aftermarket.[23]

Following Spectrum's purchase of Aftermarket in August 2019, the flow of commission payments from the four dealerships changed, with profits from F&I sales being channeled to Spectrum.[24] The commissions that Aftermarket received on the sale of F&I products at the four dealerships were deposited in various bank accounts, including mostly accounts in Aftermarket's name and, to a lesser extent, an account in Vanguard's name.[25] The evidence concerning these payments is discussed in more detail later in this ruling.

On March 29, 2021, DiRaffaele sent an email to the president of Aftermarket (Frederick Marino) stating that "as of April 1st, 2021 Bottom Line Driven will no longer be providing

---

[18] Doc. #244 at 4 (¶ 13).
[19] *Id.* at 11-12 (¶¶ 31-32); Doc. #251-1 at 15 (¶ 29).
[20] Doc. #244 at 12-14 (¶¶ 34-40); Doc. #251-1 at 15 (¶ 30).
[21] Doc. #244 at 6 (¶ 17).
[22] *Id.* at 6, 13-14 (¶¶ 17, 39); Doc. #251-1 at 13-14 (¶¶ 25-26).
[23] Doc. #244 at 6 (¶ 17).
[24] *Id.* at 7-9 (¶¶ 18-22).
[25] *Id.* at 6-7 (¶¶ 17-18); *see also* Doc. #222-2 at 245-267 (Aftermarket bank statements and checks for March 2021) (Def. Exs. 76-77).

services to Aftermarket Specialty/Vanguard Dealer Services."[26] The four dealerships soon left Aftermarket for F&I product providers that were affiliated with Bottom Line and DiRaffaele.[27]

This development led to Vanguard's filing of this lawsuit against Bottom Line and DiRaffaele. Vanguard's amended complaint alleges claims for breach of the duty of loyalty (Count One), for tortious interference with business relationships (Count Two), for violation of the Connecticut Unfair Trade Practices Act (Count Three), for unjust enrichment (Count Four), and for breach of contract (Count Five against DiRaffaele only).[28] The defendants in turn have denied Vanguard's claim and filed a CUTPA counterclaim against Vanguard.[29]

## DISCUSSION

As noted above, there are multiple motions pending. I will address each one in turn.

### *Cross-motions for summary judgment as to Vanguard's claims*

The parties have filed cross-motions for summary judgment as to Vanguard's claims against the defendants.[30] The defendants seek summary judgment as to all five counts of the amended complaint, while Vanguard seeks summary judgment solely as to the first three counts. In addition, Vanguard moves for summary judgment as to the defendants' CUTPA counterclaim, which I will address later in this ruling.

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for

---

[26] Doc. #251-1 at 20 (¶ 46); Doc. #244 at 23 (¶ 72).
[27] Doc. #251-1 at 20-21 (¶¶ 49-51).
[28] Doc. #136 at 12-17 (¶¶ 77-118).
[29] *See generally* Doc. #300.
[30] Doc. #221; Doc. #226.

summary judgment and then decide if those facts would be enough—if eventually proven at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023).[31]

The defendants argue in part that there is no genuine fact issue to show that Vanguard suffered cognizable damages because of the defendants' alleged misconduct.[32] Vanguard does not dispute that each of its causes of action requires proof of actual harm or damages.[33] Instead, it insists that it can show damages. Vanguard argues that, absent the defendants' actions, it would have continued to receive commissions on the sale of F&I products at the four Connecticut dealerships at issue here.

The defendants have convincingly shown that there is no genuine issue of fact to show that the loss of commissions from these dealerships resulted in damages to Vanguard (rather than to Aftermarket or Spectrum). To begin, it is undisputed that the bulk of revenue from the defendants' sales activity at these four dealerships was paid out to one or more bank accounts in Aftermarket's name.[34] This shows that any damages from the cessation of commissions accrued

---

[31] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[32] The defendants additionally argue that that there was no agency or contractual relationship between the defendants and Vanguard and also that any damages to Vanguard were not caused by the defendants because the four dealerships would have switched to the defendants even absent the breach of any duty or contract. Doc. #221-1 at 24-39. Because I rule in the defendants' favor with respect to their general damages argument, I need not address in this ruling these additional arguments for summary judgment.

[33] *See, e.g.*, *Marinos v. Poirot*, 132 Conn. App. 693, 699-700 (2011) ("actual harm" required for breach-of-loyalty claim); *Companions & Homemakers, Inc. v. A&B Homecare Sols., LLC*, 348 Conn. 132, 147 (2023) ("actual loss" required for tortious interference claim); *Pointe Residential Builders BH, LLC v. TMP Constr. Grp., LLC*, 213 Conn. App. 445, 459 (2022) ("ascertainable loss" required for a CUTPA violation); *Hall v. Bergman*, 296 Conn. 169, 182 (2010) ("financial detriment" required for unjust enrichment claim); *Keller v. Beckenstein*, 117 Conn. App. 550, 558 (2009) (damages an element of breach-of-contract claim).

[34] Doc. #244 at 6 (¶¶ 18(a)-(b)) (describing how commission payments from a dealership or provider of the F&I

to Aftermarket, because the general rule is that "[f]unds deposited into a bank account are presumed to belong to the entity in whose name the account is established." *In re Amdura Corp.*, 167 B.R. 640, 644 (D. Colo. 1994), *aff'd*, 75 F.3d 1447 (10th Cir. 1996).

Vanguard argues, however, that it owned Aftermarket's bank accounts because certain internal administrative records of the bank (a "Deposit Detail Receipt" and a "Deposit Image Report") identified Vanguard as a "customer" and "merchant" for checks that were made out to Aftermarket and attached to an Aftermarket payment invoice.[35] But given that Aftermarket's name appears plainly on the face of the bank statements and as payee of the checks deposited to the account in its name, the fact that the bank, for its own internal record purposes, referred to Vanguard does not create a genuine fact issue that the accounts belonged to Vanguard and not to Aftermarket. Moreover, the payments came for services performed at dealerships in Connecticut, and Vanguard was not even registered to do business in Connecticut at the relevant time.[36]

It is true that the presumption that the named account holder owns a bank account may be overcome by evidence that another party controls or is the true beneficiary of the account. *See Karaha Bodas Co. v. Pertamina*, 313 F.3d 70, 86 (2d Cir. 2002) (applying New York law to conclude that "[w]hen a party holds funds in a bank account, possession is established, and the presumption of ownership follows," but that "this presumption may be rebutted by evidence that [a third party] actually controlled the disputed funds, or that [the bank account holder] merely held the funds for the [third party], in the manner of a trustee").

---

product were paid to or deposited to an Aftermarket bank account); *see also* Doc. #222-2 at 234-267 (Def. Exs. 75-77) (Aftermarket bank statements and checks for March 2021).
[35] Doc. #244 at 7 (response to ¶ 18); Doc. #222-2 at 234-244 (Def. Ex. 75) (deposit detail and receipt and image report attached to Aftermarket invoice).
[36] Doc. #244 at 4 (¶ 12); Doc. #246-2.

To this end, Vanguard argues that its employees controlled the Aftermarket bank accounts. But Vanguard concedes that Aftermarket's accounts were controlled by *both* Vanguard and Spectrum employees.[37] Its joint administrative control function does not tend to show that it owned these accounts. Companies often cede or delegate administrative control of bank accounts to third parties such as accountants or payroll processors. *See, e.g.*, *Cachet Fin. Servs. v. MyPayrollHR,* 2020 WL 5232275, at *1 (N.D.N.Y. 2020). But that does not mean that the third party owns the company's money in the account or is damaged by the loss of money flowing into the company account.

Nor does Vanguard make any claim that it benefited from or was the true beneficiary of the commission payments made to the Aftermarket accounts. To the contrary, Vanguard concedes that these commission payments were in turn "automatically transferred to a Spectrum bank account each night" and "that all of Aftermarket Specialty's net cash is transferred to Spectrum."[38]

In other words, the ultimate beneficiary of commission payments made to Aftermarket's bank accounts was the parent company Spectrum, not the sister company Vanguard. And Vanguard further concedes that the amounts channeled to Spectrum from the bank accounts in Aftermarket's name were credited to Aftermarket—not Vanguard—for purposes of Spectrum's financial reporting.[39]

Moreover, Spectrum's financial reporting does not simply lump revenues from Aftermarket with revenues from sister companies like Vanguard; instead, it separates the net revenues, expenses, and profits of Vanguard from those of Aftermarket and other agency

---

[37] Doc. #244 at 7 (¶ 18) (Vanguard's statement that Aftermarket bank accounts "are controlled by Spectrum and Vanguard employees").
[38] *Id.* at 7-8 (¶¶ 19, 20).
[39] *Id.* at 8-9 (¶¶ 21, 22).

subsidiaries of Spectrum "which facilitates assessing of financial performance, determining management compensation, and calculating earn-out payments."[40] Thus, for all these reasons and even drawing all reasonable inferences in the summary judgment record in Vanguard's favor, there is no genuine fact issue to suggest that Vanguard suffered any damages as a result of the loss of continuing commission payments made by the four dealerships to Aftermarket's bank accounts.

The parties further agree that a small amount of commission payments (about $40,000) stemming from sales of F&I products at two of the four dealerships serviced by Aftermarket were paid at various points from 2019 to 2021 to a bank account in Vanguard's name.[41] But the companies credited these payments to Aftermarket, and Vanguard periodically transferred equivalent amounts to Aftermarket bank accounts.[42] Indeed, Vanguard's own Rule 30(b)(6) witness testified concerning these intercompany transfers that "it's not Vanguard's money, so we credit intercompany," and "we would move the money from Vanguard's account into Aftermarket's account."[43]

Again, the parties also agree that all funds deposited to Aftermarket's accounts were in turn transferred for the ultimate benefit of Spectrum and that Spectrum tracked revenues from Aftermarket separately from Vanguard.[44] So even as to the small amount of commission payments that were made to one of Vanguard's bank accounts, the evidence conclusively shows

---

[40] *Id.* at 8 (¶ 21).

[41] *Id.* at 6-7 (¶ 18(c)); Doc. #243 at 29.

[42] Doc. #244 at 6 (¶ 18(c)) (stating in relevant part as to payments made to the Vanguard bank account that "[t]he portion of payment attributable to product sales by automobile dealerships serviced by Aftermarket Specialty is credited to Aftermarket Specialty on an intercompany ledger … [and] every one or two months, a transfer of the net balance in this ledger is made between Vanguard and Aftermarket Specialty's bank accounts").

[43] Doc. #222-5 at 214 (Def. Ex. 109, Howarth Deposition at exhibit pages 140-41). In expressly referring to "Aftermarket's account," Vanguard's Rule 30(b)(6) witness made no claim—as Vanguard's counsel now does for purposes of the summary judgment motions—that there was no Aftermarket bank account but only bank accounts belonging to Vanguard.

[44] Doc. #244 at 7-9 (¶¶ 19-22).

that this bank account was merely a conduit for payments to Aftermarket, and that the revenues ultimately flowed to Spectrum. There is no genuine fact issue to show that Vanguard itself was damaged by the loss of these continuing commission payments even to its own bank account.

Vanguard's own damages analysis underscores the absence of any damages to Vanguard, as distinct from Aftermarket or Spectrum. The amended complaint seeks damages for lost revenue from the dealerships.[45] But Vanguard chose to designate an expert witness—Emily Pollack—who did not calculate damages on the basis of lost revenue *to Vanguard* but instead on the basis of the lost market value *of Spectrum* as a result of the loss of the four dealerships as customers.[46]

Vanguard then claimed that Pollack refused to testify because she was "extremely busy."[47] The Court granted leave for Vanguard to substitute an expert, subject to Vanguard's stipulation that the replacement expert would furnish an opinion consistent with Pollock's analysis and methodology and subject to the further limitation that the replacement expert would adhere to the subjects and theories covered by the previous expert without meaningful changes.[48] Vanguard disregarded this limitation by designating an expert—Trevor McClain-Duer—who belatedly issued a report secondarily calculating purported lost profits to Vanguard (based on the mistaken assumption that payments from F&I sales at the four dealerships were for Vanguard, not Aftermarket or Spectrum).[49] The fact that Vanguard decided to analyze its damages in terms of the loss to its parent company and only as an afterthought attempted to quantify damages to

---

[45] Doc. #136 at 11-12 (¶¶ 69, 76).
[46] Doc. #224 at 10-11; Doc. #221-10 at 3.
[47] Doc. #200 at 4 (¶ 7).
[48] Doc. #211 at 2, 6-8.
[49] Doc. #224 at 12-13.

itself reinforces the conclusion that any damages stemming from the defendants' alleged misconduct did not accrue to Vanguard.

In any event, Vanguard further argues that it may assert harm and damages to Aftermarket. But Vanguard and Aftermarket were not the same company. "[I]t is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. ---, 140 S. Ct. 2082, 2087 (2020). "The mere relation of entities is not shown to confer standing upon all." *R & B Realty Grp. v. Heiser*, 322 F. Supp. 2d 206, 210 (D. Conn. 2004).

Vanguard and Aftermarket were sister companies. Simply because they shared a parent and because their businesses were intertwined does not mean that corporate formalities may be disregarded and that Vanguard has *carte blanche* to sue for harm and damages to Aftermarket. To the contrary, "[a] corporation does not have independent standing to sue for injuries done to a sister or subsidiary corporation, despite the fact that their businesses are intertwined and the success of one is dependent on that of the other." 19 Am. Jur. 2d Corporations § 1849; 19 C.J.S. Corporations § 780 (same); 1 Fletcher Cyc. Corp. § 36 (same). Thus "it is black-letter law that one corporation cannot assert an affiliate's legal rights." *Variblend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, 2022 WL 17156550, at *10 (S.D.N.Y. 2022) (citing *Hudson Optical Corp. v. Cabot Safety Corp.*, 1998 WL 642471, at *3 (2d Cir. 1998) (summary order) and rejecting plaintiff company's effort to assert ownership rights of sister company despite claim that plaintiff company used the assets at issue).

Vanguard argues that it may assert the rights of Aftermarket because "Vanguard has

exercised total dominion and control over Aftermarket Specialty since it purchased the company in August 2019."[50] But *Vanguard* did not purchase Aftermarket. *Spectrum* did. And—like Aftermarket—Spectrum is not a party to this lawsuit.

Nor does Vanguard support its claim that a company who exercises "total domination and control" over a sister company has the right to pursue claims on the sister company's behalf. This claim is just a way to repudiate the principle stated above that a company does not have the right to pursue claims on behalf of its sister company merely because their businesses are intertwined.

Cases allowing plaintiffs to pierce a corporate veil by demonstrating total domination and control involve claims by *outsiders* to the corporate relationship where there has been a wrongful abuse of corporate formalities, rather than claims by affiliate *insiders* such as Vanguard who wish to disregard the corporate formalities instituted by the corporate parent. As the Supreme Court has observed, there is a "fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods*, 524 U.S. 51, 62 (1998).

To the same effect, the Connecticut Supreme Court has recently ruled that piercing the corporate veil "is an extraordinary remedy that requires, at a minimum, a determination by the court that the corporate form was used to promote a wrong or injustice, and that a fundamental unfairness would result from a failure to disregard the corporate form." *Deutsche Bank AG v.*

---

[50] Doc. #243 at 25; *see also* Doc. #242 at 16 (arguing that "Vanguard, Spectrum, and Aftermarket Specialty are considered one and the same, and Vanguard exercises complete dominion and control over Aftermarket Specialty and the other Vanguard agencies on behalf of Spectrum").

*Sebastian Holdings, Inc.*, 346 Conn. 564, 592 (2023). The court went on to state that it is *not* "sufficient only to show that the defendant exercised complete domination and control over the corporation or commingled assets." *Id.* at 593.

Because Vanguard unsurprisingly does not suggest that it exercised domination and control over Aftermarket for a wrongful purpose, it cannot rely on a veil-piercing, domination-and-control theory to assert the rights of Aftermarket. The Second Circuit has declined to "'pierce the corporate veil' in favor of those who created that veil." *Carey v. Nat'l Oil Corp.*, 592 F.2d 673, 676 (2d Cir. 1979) (*per curiam*). Thus, "[a] corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined," and "[a] corporation may not pierce the veil of another corporation that it set up for its own benefit in order to advance the claims of that corporation." *Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994); *see also Elandia Int'l, Inc. v. Koy*, 2010 WL 2179770, at *7, *report and recommendation adopted*, 2010 WL 2196040 (S.D. Fla. 2010) (same).

Vanguard misplaces its reliance on *Saunders v. Briner*, 334 Conn. 135 (2019), in which the Connecticut Supreme Court noted the general rule "that members of limited liability companies cannot bring direct actions to recover for injuries suffered by the company," but then recognized an exception "when the unique circumstance arises in which the sole member of a limited liability company seeks to remedy a harm suffered by it, [in which] a trial court may permit such a member to bring his claims in a direct action, as long as doing so does not implicate the policy justifications that underlie the distinct and separate injury requirement." *Id.* at 167. This ruling is plainly inapposite. Vanguard is not a member or owner of Aftermarket; it is

14

merely a sister company. Nor does the ruling stand for some general principle that corporate formalities may be ignored.

Vanguard similarly misplaces its reliance on *Marlin Broadcasting LLC v. Law Offices of Kent Avery, LLC.*, 101 Conn. App. 638 (2007), because that case turned on the court's ruling that there was no evidence that the two businesses at issue were separate and distinct legal entities. *Id.* at 645. Here, by contrast, there is no dispute that Vanguard and Aftermarket are separate and distinct legal entities incorporated in different jurisdictions.

In short, there is no genuine issue of fact to show that Vanguard was damaged by the alleged misconduct of the defendants with respect to any of Vanguard's claims. Vanguard has not shown that it was damaged by any loss of commissions from sales at the car dealerships. And Vanguard cannot claim the damages that accrued to non-parties like Aftermarket or Spectrum. Accordingly, I will grant the defendants' motion for summary judgment as to all of Vanguard's claims and reciprocally deny Vanguard's motion for summary judgment as to the first three counts of the amended complaint.

### *Motion to preclude Vanguard's expert*

In conjunction with their motion for summary judgment, the defendants have filed a motion to preclude the testimony of Vanguard's damages expert, Trevor McClain-Duer.[51] The defendants argue that his proffered opinions "are irrelevant because they measure damages sustained by Aftermarket Specialty and/or its parent company, Spectrum Automotive Holdings Corp. ("Spectrum"), not Vanguard," and because "[b]oth of McClain-Duer's damages measures specifically rely on the loss of earnings attributed to Aftermarket Specialty—not Vanguard—in accounting records, and deposited in Aftermarket Specialty's—not Vanguard's—bank

---

[51] Doc. #223.

accounts."[52] The defendants further argue that McClain-Duer's opinion "violates this Court's substitution order and was untimely even under the revised schedule set by the Court," and that "Vanguard cannot at this late date reverse its tactical choice to seek lost market value rather than lost profits damages."[53]

I agree with the defendants for all the reasons set forth above with respect to my ruling granting the defendants' motion for summary judgment. Moreover, as noted above, McClain-Duer's supplemental expert report attempts to quantify Vanguard's damages using a measure and methodology that is wholly different from Vanguard's initial expert and thus violates the restriction that the Court placed on Vanguard's replacement of its expert. Vanguard's bait-and-switch tactic independently justifies preclusion. Accordingly, I will grant the defendants' motion to preclude Vanguard's damages expert.

### *Vanguard's motion to supplement the summary judgment record*

On July 14, 2023, Vanguard filed a motion to supplement the summary judgment record.[54] It seeks to supplement the record to show that Vanguard and Aftermarket merged on June 23, 2023, and it argues that this intervening merger moots the defendants' arguments that Vanguard did not suffer damages.[55] The motion was filed more than two months after the Court heard oral argument on the cross-motions for summary judgment and long after discovery closed.

A district court has discretion to allow a party to supplement the summary judgment record. *See Perry v. Spano*, 328 F. App'x 104, 105 (2d Cir. 2009). Because Vanguard's motion to supplement would necessarily require a modification of the scheduling order, Vanguard must

---

[52] Doc. #224 at 6.
[53] *Id.* at 7.
[54] Doc. #317
[55] *Id.* at 1, 3.

at least show good cause. *See* Fed. R. Civ. P. 16(b). To show good cause, Vanguard must demonstrate diligence and that its proposed change to the schedule would not significantly prejudice the defendants. *See Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013). "We are particularly likely to find prejudice where the parties have already completed discovery and the defendant has moved for summary judgment." *Ibid.*

I will deny the motion to supplement the record for substantially the reasons well-stated in the defendants' objection.[56] As the defendants demonstrate, the issue of Vanguard's right to claim damages was highlighted early in this litigation, yet there was no motion to amend the pleadings to proceed under the name of Aftermarket or Spectrum, and Vanguard disclaimed any intention to merge.[57] Although Vanguard insists that it filed its motion promptly after the merger occurred, this ignores that the timing of any merger was always under Vanguard's or Spectrum's complete control.[58] Vanguard does not justify the belated merger for any reason other than for its tactical litigation advantage in light of the arguments raised in the defendants' briefing as well as the concerns stated by the Court itself at oral argument on the summary judgment motions.

In the meantime, if I were to allow Vanguard to supplement the summary judgment record, fairness would require that I also allow the defendants to engage in further discovery with respect to the merger and that I schedule yet another round of summary judgment briefing on the complex issues of damages—made all the more complicated now in terms of attribution. It is fanciful for Vanguard to suggest that the defendants are not entitled to any discovery and that

---

[56] Doc. #321.
[57] *Id.* at 2-3.
[58] This distinguishes Vanguard's motion to supplement from the defendants' motion to file an amended counterclaim, which was based on events prompted by Vanguard's settlement agreement with CreditGuard and therefore outside of the defendants' control.

17

"any such prejudice [to the defendants] can be remedied by permitting them to file a short supplemental response to Vanguard's proposed supplemental filing."[59]

The defendants would be further prejudiced because of the substantial resources and efforts they have devoted to date to develop and brief the issue of damages and in reliance on a pre-merger factual record. I am concerned as well by indications that Vanguard's motion is one more step to try to prolong this litigation to the disadvantage of defendants who appear to have far fewer resources than Vanguard and its parent company.[60]

Other courts have declined to allow a party to sandbag the opposing party with late-disclosed evidence to try to defeat summary judgment. *See Iacovacci v. Brevet Holdings, LLC*, 2023 WL 2631966, at *5 (declining to rely on evidence offered to defeat summary judgment that was withheld during discovery, noting that "[b]ecause the invoice was not produced during discovery, Defendants were deprived of the opportunity to discover, take depositions, and respond"), *recon. denied*, 2023 WL 4118086 (S.D.N.Y. 2023); *Mantel v. Microsoft Corp.*, 2018 WL 1602863, at *4 (S.D.N.Y. 2018) (declining to consider evidence produced by plaintiff for the first time at summary judgment because "[i]t would ... be highly prejudicial to Defendants to allow the Plaintiff to supplement the record with dispositive evidence after the motions for summary judgment have been fully briefed," because supplementing "the record now would require discovery to be reopened because it would require Defendants to conduct further discovery, including potentially depositions, and to adopt a very different litigation strategy," and because "the bell cannot be unrung with regard to the time and money devoted by the parties to summary judgment based on the evidentiary record as developed"). Although these two cases involved discovery violations, the prejudice to the defendants is no different here.

---

[59] Doc. #317 at 7-8.
[60] Doc. #221-1 at 23; Doc. #224 at 34.

In short, Vanguard did not act with diligence, and its motion to supplement the summary judgment record would result in unfair prejudice to the defendants. Accordingly, in my discretion, I will deny Vanguard's motion to supplement the summary judgment record.

### The defendants' counterclaim and Vanguard's objections to Judge Vatti's ruling

The defendants filed an answer and counterclaim alleging that Vanguard violated CUTPA.[61] This counterclaim was a subject of Vanguard's motion for summary judgment that was filed on January 3, 2023.[62]

On March 23, 2023, however, the defendants filed a motion for leave to amend their counterclaim in light of new information concerning the terms of Vanguard's settlement with a formerly named defendant, CreditGuard Corporation.[63] The defendants also moved for leave to file a supplemental opposition to Vanguard's motion for summary judgment with respect to the allegations of the proposed amended counterclaim.[64]

On May 1, 2023, Judge Vatti granted in part and denied in part the defendants' motion to file an amended counterclaim.[65] The defendants in turn filed their second amended counterclaim on May 3, 2023 in conformity with Judge Vatti's order.[66]

Vanguard has since filed an objection to Judge Vatti's order allowing the filing of an amended counterclaim, arguing that it was in error because Judge Vatti did not evaluate whether the proposed amendment would be futile.[67] I will overrule this objection because, in light of the nature of the counterclaim, it would have been premature for Judge Vatti to make a futility determination while the cross motions for summary judgment were still pending before me. Nor

---

[61] Doc. #148 at 19-24.
[62] Doc. #226.
[63] Doc. #281.
[64] Doc. #282.
[65] Doc. #297.
[66] Doc. #300.
[67] Doc. #301.

am I convinced that the proposed amendment—which concerns the terms of the CreditGuard settlement agreement, specifically terms that appear to be significantly adverse to the defendants' business—would be necessarily futile to bolster the defendants' claim of a CUTPA violation.

I will also overrule Vanguard's second objection to Judge Vatti's ruling, namely, its claim that Judge Vatti improperly disclosed on the public record in his ruling that Vanguard's settlement agreement with CreditGuard required CreditGuard not to work with the defendants for a period of two years to place its products at more than 330 dealerships in Connecticut, Massachusetts, and New York.[68] This newly disclosed and apparently overbroad and oppressive term of the settlement agreement appears to furnish significant grounds to allow the defendants to amend their CUTPA counterclaim. Accordingly, there was a strong interest in public disclosure of this particular term of the settlement agreement as a basis for a judicial decision. There is no merit to Vanguard's argument that this term of the settlement agreement should have remained sealed or undisclosed in Judge Vatti's ruling.

Vanguard further objects to Judge Vatti's later docket order that declined to seal additional provisions of the settlement agreement.[69] I will overrule that objection as well because Judge Vatti otherwise properly weighed the interests of public access with respect to those additional portions of the settlement agreement that he declined to place under seal. As this Court's local rules make clear, the fact that the parties have stipulated or chosen to designate a document as confidential is not itself sufficient to warrant sealing. *See* D. Conn. L. Civ. R. 5(e)(3). And I share Judge Vatti's concerns that "the number and nature of the sealing requests has been markedly disproportionate to the needs of this case," reflecting "both an abundance of confidentiality designations under the Standing Protective Order and a lack of distinction

---

[68] Doc. #301 at 2-4.
[69] Doc. #298.

between disclosures that are merely uncomfortable as opposed to potentially and realistically competitively harmful."[70]

Having overruled Vanguard's objection to the filing of an amended counterclaim, Vanguard's summary judgment challenge against the prior counterclaim is now moot. Accordingly, I will deny as moot Vanguard's summary judgment challenge to the defendants' counterclaim until such time that it may be ripe for the filing of a renewed motion for summary judgement. As it is, however, we are still at the pleading stage for purposes of the counterclaim; Vanguard has yet to file an answer or other pleading response to the second amended counterclaim. Vanguard shall file any answer or other response to the second amended counterclaim on or before **January 29, 2024**. Counsel shall thereafter file a proposed scheduling order on or before **February 5, 2024** with respect to disposition of the CUTPA counterclaim.

Likewise, because I have denied as moot Vanguard's motion for summary judgment as to the defendants' counterclaim, I will deny as premature the defendants' motion for leave to file supplemental summary judgment briefing with respect to the second amended counterclaim. Such supplemental summary judgment briefing would be premature in view of the fact that Vanguard has yet to file an answer or other pleading response to the second amended counterclaim.

## CONCLUSION

For the reasons set forth above, the Court enters the following orders with respect to pending motions:

- The Court GRANTS the defendants' motion for summary judgment as to Counts One through Five of the amended complaint (Doc. #221).

---

[70] Doc. #295.

- The Court DENIES Vanguard's motion for summary judgment as to Counts One through Three of the amended complaint (Doc. #226).

- The Court GRANTS the defendants' motion to preclude the expert testimony of Trevor McClain-Duer (Doc. #223).

- The Court DENIES Vanguard's motion to supplement the summary judgment record (Doc. #317).

- The Court OVERRULES Vanguard's various objections to Judge Vatti's order granting leave for the filing of defendants' second amended counterclaim, reciting on the public record a term of the settlement agreement between Vanguard and CreditGuard, and declining to seal all of the settlement agreement (Doc. #301).

- The Court DENIES as moot and without prejudice Vanguard's motion for summary judgment as to the defendants' CUTPA counterclaim (Doc. #226).

- The Court DENIES as premature and without prejudice the defendants' motion for leave to file supplemental summary judgment briefing with respect to the second amended counterclaim (Doc. #282).

- Vanguard shall file any answer or other response to the second amended counterclaim on or before **January 29, 2024**. Counsel shall thereafter file a proposed scheduling order on or before **February 5, 2024** with respect to disposition of the CUTPA counterclaim.

It is so ordered.

Dated at New Haven this 8th day of January 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge